**Althea G. WILLIAMS, Appellant,**

v.

**UNITED STATES of America,**
**Appellee.**

**No. 15338.**

United States Court of Appeals
Ninth Circuit.

Sept. 26, 1957.

Henry C. Clausen, San Francisco, Cal., for appellant.

George C. Doub, Asst. Atty. Gen., Morton Hollander, Paul A. Sweeney, Attorneys, Department of Justice, Washington, D. C., Lloyd H. Burke, U. S. Atty., San Francisco, Cal., for appellee.

Before STEPHENS, Chief Judge, and BONE and CHAMBERS, Circuit Judges.

BONE, Circuit Judge.

The instant appeal brings this Tort Claims Act suit here for the second time. See decision of this Court in Williams v. United States, 9 Cir., 215 F.2d 800. On certiorari to the Supreme Court, that Court vacated the judgment of this Court and in a brief order (350 U.S. 857, 76 S.Ct. 100, 100 L.Ed. 761) remanded the case "for consideration" in the light of the controlling California doctrine of respondeat superior. Upon this remand the case was further "considered" by the District Court *on the original trial record* upon which that court based its first decision reported in 105 F.Supp. 208. The District Court rendered a second opinion and decision which is reported in 141 F.Supp. 851. The present appeal is from the judgment entered on this second decision.

### The Basic Facts

From the record certain ,facts appear to be clearly established. Appellant, an employee of a private construction firm on the Island of Guam, sustained personal injuries when a parked car in which she was sitting was struck by a military vehicle driven by Corporal Seabourn. The accident occurred near a "breakwater" parking spot in Agana, Guam at or about 10:30 p. m. on March 3, 1949. Seabourn had obtained an official pass to leave the Guam army base where he was stationed, this pass covering (so far as all of the evidence reveals) the entire day and night of March 3, 1949. During the afternoon of that day and while authorized to be away from his army post, Seabourn in the company of two other soldiers (Schmidt and Vincent) engaged in drinking intoxicating beverages.

The three men returned to their army base "unit" about 7 p. m. on that day and while there, Sergeant Stiles, a member of Seabourn's company, handed Seabourn a so-called "trip ticket" for a ¾ ton vehicle known as a "weapons carrier." This ticket had been made out about 8 a. m. of that morning to a driver named Cabera, a soldier who also worked with Seabourn. The "ticket" indicates that on the day in question the vehicle had been requested by a Lt. W. R. Werb, and the *use* of the vehicle was therein authorized for "Official Business." Listed on the ticket are the various points to which the weapons carrier was driven that day. Neither Seabourn's nor Stiles' name appears on the ticket, nor was Seabourn's *use* of the vehicle in any way indicated thereon.

In the army company "unit" or "section" in which Seabourn was serving, a loose practice had prevailed for several months under which servicemen in this unit were able to secure possession of army vehicles to drive for their own pleasure, this being accomplished by these men by informally "passing around" among themselves "trip tickets" which might have been issued to another driver for official army use, in this case the vehicle involved having been assigned to a man named Cabera for the use of Lieutenant Werb on the day of the accident.

Having secured the vehicle that evening by such informal means, Seabourn (in company with Schmidt and Vincent) drove the army vehicle to the Enlisted Men's Club on the Island where they drank beer and champagne after which they decided to "go for a ride." Thereafter, and prior to the accident here involved, and at a rather late hour, Seabourn let his companions out of the army vehicle and "took off" alone. It was during this night drive that the accident occurred at a time when, according to Seabourn's sworn statement, he was driving the vehicle "only for recreation." His two companions made official statements under oath for official army records, these statements setting forth many of the above mentioned facts. In the course of this litigation, the recitals in these records, and their later depositions, contained the averment that at the time Seabourn left them to make his night drive he was "definitely drunk" and "very drunk." Seabourn swore that he remembered nothing that occurred after he left Schmidt and Vincent except that the next morning he awoke alongside the road when the sun was shining.

None of these three men claimed that they were required to execute military orders of any kind, or to perform military duties of any kind while away from their post on March 3, 1949, nor do they attempt to claim that army regulations then in force sanctioned the informal use of army vehicles for the purpose, and under the conditions of use shown by Seabourn's activities on that day and night.

Furthermore, there is absolutely nothing in the record to show that Seabourn's superior military officers had personal knowledge of, or control or supervision over, the use of the vehicle while it was in Seabourn's possession on all of the day and night of March 3, 1949, nor any control over Seabourn's activities after he got the trip ticket from Stiles on that evening and thus used the Cabera ticket which had been issued that morning for the use of Lt. Werb. Nor had any military order been issued by a superior officer directing, authorizing or permitting Seabourn to drive or use the vehicle during that day or night *for any purpose,* military or otherwise (including "recreation"), or for the discharge of any kind of a military order or duty.

Based upon the general facts we outline above, appellant's complaint against the United States under the Tort Claims Act, 28 U.S.C.A. §§ 1346, 2671 et seq., asserted, inter alia, that Seabourn's negligent operation of the vehicle during his night drive *was in the line of his duty for the Government.* The Government's answer, inter alia, denied this assertion.

■ Preliminarily, it should be made plain that, relying on application of the doctrine of respondeat superior as ap-

plied in California (from which Guam law on the subject derives), appellant has at all time strenuously contended (as her basic premise), that "Seabourn was *not acting outside* the scope of his employment" when he crashed his army vehicle into the parked car in which appellant was sitting; that at the time of the crash "the soldier was acting within the course and scope of (his) employment *by seeking entertainment that night"*; that "entertainment" (including driving merely for pleasure) on Guam is essential to a soldier's morale; that morale "is necessary to the maintenance of efficiency in the armed forces there," hence Seabourn's night drive came within the scope of an "official duty" to himself and the army.

Before reaching appellant's theory of government liability as amplified in her briefs, we emphasize that nothing presented in the record suggests or supports a conclusion of fact or law that on his night drive Seabourn was then in any way *combining* this venture with any sort of "official business" of the army, *unless* the circumstances (a so-called "common practice" in his army company unit) under which he secured the use of the army vehicle for recreation can be said to make this night drive an activity which (as a matter of law) must be held to represent a *combining* of his drive for personal recreation with the discharge of some "official business" for the army. As we have noted above, Seabourn frankly avowed under oath that he was then "driving for recreation"; nowhere in either his affidavit or deposition does he (or any other witness in the case) assert that a superior officer had directed (or given permission to) Seabourn to use the army vehicle for *any purpose* on March 3, 1949, or that he drove it that night *to execute any military orders* in connection with his army duties. In this very material and highly significant respect the facts of this case abruptly part company with the facts of our later noted Murphey case [Murphey v. U. S.], 9 Cir., 179 F.2d 743, where the driver of the army vehicle was

acting *under specific direction of a superior officer when he made his night drive.* Yet appellant strenuously argues that *this case is on all fours with the facts of the Murphey case;* that its facts make it fit the facts of the Murphey case "to a T."

We outlined above the basic facts of this case in order to relate them to the specific arguments here advanced by appellant in her briefs since they serve to clearly delineate the legal basis of her claim of government liability under the Tort Claims Act, that is to say, a claim resting squarely on the "recreation-morale" theory as buttressed by the claimed "practice" and/or "policy" in vogue in Seabourn's company unit. These arguments are set out in considerable detail just below.

### Appellant's Position

Appellant urges that: Vehicles were necessary for recreational purposes on Guam due to "distances" on the Island; all officers and enlisted men in Seabourn's unit followed the practice of circulating trip tickets; this unit practice had prevailed for at least fifteen months prior to the accident; this unit practice was a long-established "army custom" and a standard operating procedure; Seabourn was "engaged *in a series of authorized acts,* namely, driving the vehicle for recreation *to and from* recreational facilities provided by the Government *at the time of the accident"*; "under the peculiar circumstances of Seabourn's overseas service, his night drive was "for a governmental purpose" to wit, "the improvement of (his) morale"; the "improvement of morale," as such, is announced in Murphey v. United States, supra, 179 F.2d 743 *which was approved by the Supreme Court;* Seabourn *was authorized to use the vehicle for recreation because of the "custom, practice and standard operating procedure" in vogue in Seabourn's unit;* under the "practice" of Seabourn's unit, the same trip ticket "would be passed around from new driver to new driver"; Seabourn's *use* of the vehicle *was authorized specifically* because he secured the trip ticket *"while*

[he was] *the official motor pool army dispatcher"*; "even assuming that this army custom and practice might have *technically violated some general Army Regulations* still in the eyes of the law *such hypertechnicality should not and does not affect the rights of an injured third person";* therefore "the question of technical violation of Army Regulations is more or less moot," even if (as appellant says she argued before the Supreme Court) "the vehicle was not operated according to the strict terms of (the then) Army Regulations 700–105,[1] still the Government would be liable *because* of the injured third person"; "the violation of an *unenforced and ignored* [in his unit] Army Regulation could not be relied upon by the government to avoid liability, for to do so would permit the government to immunize itself *by the unfair device of enacting regulations bounding the scope of employment of its servants* while at the same time *in practice and in fact authorizing its servants to perform the proscribed acts";* the (above mentioned) practice *"was itself evidence of authority, of permission, and of the 'scope' of employment for soldiers stationed on Guam at the time of the accident";* that being (so) *authorized,* "Seabourn's authorized use of the army vehicle for recreation was within the scope of his employment. It does not matter that that use was negligent nor that the use gave him personal enjoyment. Under the peculiar facts and circumstances of this case, a governmental purpose was being served which fixes liability upon the government"—*this under the rule of respondeat superior;* what Seabourn did by his night drive was in keeping with the realities of morale maintenance since this drive was for "recreational purposes"; that "concepts change and it is no longer true, as appellee contends, that the employee at the time of the accident in order to impose liability must be engaged in 'work' or in performance of 'duties'. * * * *It does not matter that Seabourn was not performing his duty as supply clerk or performing any other so-called 'official duties' ";* that "this is not a case where a soldier is on a 'stateside pass' seeking 'stateside' pleasure."—"this is a case like Murphey v. U. S.";—it is a case *"where the servant is combining his own business with that of his master, or attending to both at substantially the same time,"* (thus coming within the California rule of Ryan v. Farrell, 1929, 208 Cal. 200, 280 P. 945); that under the facts of the instant case, Seabourn's "scope of employment is *broadened* to include recreational activities, including driving for recreation" (under *the "specific authorization"* above noted); thus "the doing of *an authorized act* in a wrongful or prohibited manner will not preclude responsibility of the employer * * * the test is not whether the wrongful act itself was authorized but whether it was committed in the course of a series of acts of the agent which were authorized by the principal and while the agent *was still occupying himself* with the principal's

1. "B. Army Regulations 700–105 (30 June 1948) provide in pertinent part:
  "26. Use of vehicles.— * * *
  "b. Motor vehicles * * * will be operated * * * only if properly dispatched on W. D. Form 48 (Drivers' Trip Ticket and Preventive Maintenance Service Record), issued by the dispatching motor pool or under such instructions as the appropriate commander under existing authority may direct.
  "c. Motor vehicles will be used only for official business, including the special uses listed in paragraph 28.
    * * * * *
  "28. Special uses.—Motor Vehicles, when available without detriment to other official business * * * may be used by special direction of the commanding officer for the following purposes:
  "a. Authorized athletics
  "b. Transporting personnel, including entertainers and party guests, and supplies and equipment in connection with authorized, organized, and supervised recreational, welfare, and morale-building activities.
    * * * * *
  "29. Motor pools.— * * *
  "d. Vehicles will be dispatched from pools to perform specific tasks, and will not be permanently allocated or assigned to any agency, or individual, except as prescribed herein."

business *within the scope of his added employment,"* (citing Deevy v. Tassi, 1942, 21 Cal.2d 109, 125, 130 P.2d 389).

Appellant adds the contention that since Seabourn had been "authorized" to use the vehicle for the purpose of recreation, there is no distinction between entertainment and recreation (or "movies" as in our Murphey case, supra). She also tenders the contention that *"the issue is clearly presented by the evidence whether Seabourn had departed from and resumed his employment * * * if* the Murphey case driver [who drove on instructions from a superior officer] was not on such a departure or frolic as would preclude liability, then neither was Corporal Seabourn."

In short, the argument is that Seabourn was indulging in "recreation" by his drive and this fact made his driving activity "government business" (or at least an activity which *combined* recreation with government business) "within the scope of his employment." And it is finally argued that the Supreme Court "held" in the instant case "that the issue of scope of employment is governed by the California rule of respondeat superior, *not* federal law, decisions *or*

[*army*] *regulations, whether they were enforced or not."*

Since appellant argues that the Supreme Court actually "held" in the instant case that *Army Regulations*[1] then in force have no application whatever to the peculiar facts and circumstances revealed by the record in this case (a contention that finds no support in the text of its brief order of remand) it is crystal clear that she thinks that this Court is *required* to wholly disregard the existence of such regulations in disposing of this case. (See footnote 3, infra.)

We think that what is set out just above fairly summarizes appellant's position.

So far as we are aware, no federal court has ever held that the Army is not free to adopt and enforce reasonable regulations to govern the use of its vehicles *by* servicemen and officers, *or* that such regulations can, or must be, wholly disregarded by a court when a use of army vehicles by servicemen, not in compliance with, but in violation of, army regulations, has been accomplished in the irregular manner revealed by the record in this case.[2] While appellant

---

1. See note 1 on page 497.

2. Enactment of the Federal Tort Claims Act represented a statutory relinquishment of sovereign immunity from suit for torts of the Government's servants and employees. But we find nothing in that Act which requires us to completely ignore and/or literally abrogate, as utterly meaningless, a pertinent code of Army Regulations which were designed to administratively regulate intramural operations involving and relating to the use of army vehicles by members of the armed forces. It cannot be said that these earlier adopted regulations represent a studied, unreasonable and captious purpose to nullify subsequent suits based on the Tort Claims Act or to deny justice to a plaintiff in peculiar factual situations such as those disclosed by the record before us. For us to adopt appellant's theory would be tantamount to a declaration that the army must stand helpless in the face of open violations of its regulations relating to the use by its members of vehicles employed for only *specifically designated* forms of recreation.

In practical effect this would be an unwarranted intrusion by the courts into a legitimate field of army discipline. Certainly nothing in the facts of this case could possibly warrant or justify such judicial action.

While it may be conceded that his pass for that day and night might have been cancelled at any time during this period of time had military authorities required his services, the record reveals that this was not done.

The arguments of appellant invite a word concerning the here present sovereign-soldier relationship and the right of the sovereign to define the boundaries of *that relationship.* Certain it is that such a relationship is not governed by state law—even under the Erie-Tompkins doctrine. A judgment of this Court was affirmed in United States v. Standard Oil Co., 332 U.S. 301, at pages 305, 306, 309, 310, 67 S.Ct. 1604, at page 1607, 91 L.Ed. 2067, and in its decision the Supreme Court significantly stated that *"perhaps no relation between the Government and a citizen is more distinctively federal in*

does not challenge the validity of these regulations, she apparently construes them as a set of rules drafted with a calculated purpose and design to defeat certain types of tort claims by injured third persons. This seems evident by the arguments in her brief. She urges that "the rights of injured third persons are to be governed by the principles of respondeat superior, not by the skill of some legal draftsman in the Pentagon, who might, by legal fiction and blind to actualities, so draft or construe administrative regulations as to defeat tort claims by injured third persons. Where authority to do an act is, in fact, granted, *this Court has held in the Murphey case,* and the Supreme Court has gone along with the California doctrine that the government thereby becomes liable."

Appellant relies heavily on what she now declares to be a precise *holding* of this Court in its Murphey decision. She asserts (p. 7 reply brief) that "this very Court [there] *held*" that—

"*where permission has been granted as a general custom* to use an army vehicle for recreation, such *practice* fixes liability upon the government and renders groundless the trial court's findings that the soldier was not acting within the

scope of his employment, *even though in a particular case there is positive testimony of prohibitive orders.*" [3]  (Emphasis is ours.)

An examination of the language of our Murphey decision reveals the absence of any such explicit *holding* therein. We therefore assume that appellant is presently endeavoring to read into this decision a non-existent judicial pronouncement of this Court on the issues in that case.

In summary, appellant's own arguments outlined above, together with facts firmly established by the record, serve to clearly establish to our entire satisfaction the following highly material facts. They are: (1) Seabourn was away from his post on a pass covering all of March 3, 1949, and it is not contended that on this day and at the time of the accident he was executing any order of, or acting under permission of, a superior officer on his drive when the car crash occurred; (2) a *claim* by appellant that at the time of the crash Seabourn was indulging in "officially authorized" recreation; that even though he was not *then* performing any duty assigned to him by a superior officer, or driving with the permission of such an officer, or driving the vehicle under conditions specifi-

---

*character than that between it and members of its armed forces.* To whatever extent state law may apply to govern the relations between soldiers or others in the armed forces *and persons outside them* * * * the scope, nature, legal incidents and consequences of *the relation* between persons in service and the Government *are fundamentally derived from federal sources and governed by federal authority.*" (Emphasis supplied.)

So far as we are aware, the Supreme Court has never seen fit to recede from the "relationship" doctrine above noted. Therefore this Court cannot agree that it is free to wholly disregard, or nullify, regulations lawfully promulgated by the army for the purpose of governing the administration of its purely internal operations (such as control of the use of army vehicles by servicemen and officers). And see footnote 3, infra.

3. We assume that in referring (in this purported quotation) to "prohibitive or-

ders," appellant is calling attention to the pertinent Army Regulations cited in the Government's brief which sets forth the then applicable Army Regulations. From this citation we conclude that the date of promulgation and/or adoption of these regulations was June 30, 1948. The claim in the instant case arises from an accident occurring in March of 1949. We cannot conclude that these earlier adopted regulations represent a studied purpose of the army to *defeat* later tort claims based on a set of facts here confronting us. We must and do assume that these administrative regulations have the force and effect of law; at no point is it argued that they are out of harmony with any statutory provision or provisions. See Standard Oil Company of California v. Johnson, 316 U.S. 481, 483, 484, 62 S. Ct. 1168, 1170, 86 L.Ed. 1611, where the Court held that army regulations "have the force of law" (citing apposite cases in footnote 5 of that opinion).

cally sanctioned by army regulations, nevertheless Seabourn must be held to have then been engaged in performing "government business," or (under the California rule of respondeat superior) at least *combining* his then private pursuit of recreation with the business of the master; (3) a *claim* of appellant that Seabourn's night ride must be held to have been an "officially authorized" activity *because* of the loose "practice and/or policy" in his "company unit" under which he managed to "check out" the vehicle "while the official motor pool army dispatcher"; (4) the claim of appellant that the loose "practice" in Seabourn's unit of "passing trip tickets around from driver to driver" became translated into an "officially sanctioned use" *because* the late drive (even though Seabourn was very drunk and certainly in no condition to execute any sort of order) was, in any event, a legitimate and officially sanctioned means of sustaining his "morale," thus making it come within the line of his duty to the Government.

### The Record of Depositions and Statements

On March 7, 1949, the soldier Seabourn executed and signed an affidavit before a person qualified to take acknowledgments, and this document became and remained a part of the official army record which was before this Court and the lower court. It is Seabourn's own recital of facts made shortly after the accident. Later, and in San Francisco, California, Seabourn made and signed a deposition which was also part of the record before this and the lower court. We have carefully read both of these Seabourn documents and also the sworn statements and/or depositions of his fellow soldiers Schmidt and Vincent who were with Seabourn during a part of the day and the earlier part of the evening of March 3, 1949. As stated by Schmidt, Seabourn's soldier friend, "That's about all we did, drinking and running around." And this statement about sums up what these three young men did after Seabourn secured the army vehicle and up to the time when Seabourn, then very drunk, "took off" alone for his night drive.

It would unduly burden this opinion to quote at length from these several documents; it is sufficient to say that the averments therein do not part company in any here material way with the basic facts established in the record before us. Upon these facts appellant seeks to impose vicarious liability on the United States.

### The Government's Position

Appellee says that the question before us is whether the trial court, in light of the applicable California rule of respondeat superior, correctly held that the Federal Government was not liable for injuries caused by a serviceman who, while off duty and on a pass, obtained unauthorized use of a military vehicle and went joy riding in it.

The Government rejects as unsound appellant's argument that pertinent army regulations are in no way applicable to Seabourn's entertainment activities at the time of the accident. It asserts generally that "recreation" of the peculiar character here shown can hardly be termed an aid to the maintenance or improvement of the efficiency of troops; that even if it be assumed that in Seabourn's particular unit it had become a practice for military vehicles to be "passed on" from one serviceman to another and surreptitiously used (despite the official nature of a trip ticket) for off-post individual recreation, that sort of casual practice (in plain contravention of applicable Army Regulations) cannot transform Seabourn's drunken frolic *into a recreational activity within the scope of his employment,* since such a frolic obviously served no governmental purpose or interest and cannot be viewed as coming within the employee's "scope of employment" under California law.

The government also argues that since pertinent Army Regulations *forbade* any "practice" by servicemen of passing army vehicles around and using them as Seabourn did here, his night drive was

clearly unauthorized and was not made for the benefit of the service. In short, an irregular custom or practice in his unit of violating army regulations for personal ends would not justify a holding by this Court that he was acting within the scope of his employment when he injured appellee, this for the reason, and upon the *assumption* that Seabourn's peculiar night drive would *improve and not impair* his efficiency and would increase his work output, with a resulting *benefit* to his employer.

The Government emphasizes that in arguments to support her case, appellant has (1) consistently *assumed* that the record requires a finding of a custom or practice in Seabourn's unit which legally justified servicemen's use of military vehicles issued to others for official use, this for their individual recreational purposes, and (2) she urges that this practice is *enough* (despite Army Regulations) to *demonstrate* that Seabourn was acting within the scope of his employment. It was pointed out by the Government that both the lower court and this Court *found* that no responsible army official had authorized Seabourn's use of the vehicle. In other words, the Government says that appellant would have us bridge an impassable chasm with an *assumption* of fact and law not justified by the record.

The Government further contends (and we agree) that the record fully discloses and establishes that on his night drive Seabourn was away from his post on a pass and then free from any disclosed military duty, and that no superior army officer countenanced, or even knew about, Seabourn's night use of the vehicle, or had any sort of control over this use.

### The Cases

In light of the fact situation we have discussed, the problem to be resolved is the application of the California doctrine of respondeat superior so far as several pertinent decisions reveal it.

In considering these decisions we have noted the application of this orthodox doctrine in federal cases and in state court decisions in situations where the courts did not part company with the basic principles announced in the California cases. Both parties have cited and relied upon such cases.

We think that there has been no basic change in the California law of "scope of employment" since the date of our earlier opinion in this case (215 F.2d 800). In considering the opinions cited by the parties we do not lose sight of the fact that the armed services (like private employers) are concerned with the morale of, and recreation for, servicemen. A sound recreational program (envisioned in the army regulations) improves employees' morale and efficiency, enables them to maintain work at a higher level, and thus indirectly benefits the employer's business. And it may be conceded that on an isolated island like Guam there may be even greater need for employer-organized and employer-supervised recreational activities than in the continental United States. Even so, such army "recreational activities" come within the sweep of army regulations.

Our Murphey decision (179 F.2d 743) heavily relied on by appellant, holds nothing more, in substance, than that the driver of an army truck, *acting pursuant to specific official orders* in carrying (transporting) in an army vehicle an organized group of soldiers into town *for a specified recreational activity,* is within the scope of his employment even though the accident happened about two or three blocks *off his prescribed route.* In that case we were also dealing with an isolated army post.

One need not examine a multitude of cases to justify application of the basic and universally accepted rule in our jurisprudence that a pre-condition for application of the respondeat superior doctrine is that the employer becomes vicariously liable *only* when the servant, at the time of the accident, is "conducting the master's affairs," United States v. Eleazer, 4 Cir., 177 F.2d 914, 916. Or as Judge Cardozo expressed it in Fiocco v. Carver, 234 N.Y. 219, 223,

137 N.E. 309, 311, "the dominant purpose must be proved to be the performance of the master's business." In no material respect does California jurisprudence part company with, or fail to recognize, that the touchstone for respondeat superior liability is the furtherance of the master's business at the time of the accident.

It is crystal clear that in this case Seabourn was "off duty" on all of March 3, 1949 on a pass, and was not executing any order of his superior officers at the time of the accident. To surmount the difficulty created by this fact situation, appellant has adopted a theory under which she claims that his "off duty" night drive must (as a matter of law) be regarded by us as within his line of duty *because* it was an "authorized recreational activity" of a character which *automatically* brought it within the scope of his military employment. This so-called "authorization" is claimed to arise from the "common practice" (or "policy") in vogue in his army unit which made it possible for servicemen in that unit to secure and use army vehicles *for their own amusement.* At no point in arguing her theory does appellant attempt to justify Seabourn's use of the vehicle by reference to, or reliance upon, the then applicable Army Regulations we have cited.[1] Under her theory, they must go out of the case because they have no application to the peculiar facts of this case.

In attempting to tie the facts of this case to the facts we detailed in our first Williams opinion, appellant has obviously overlooked the exact language we used in that first opinion. On page 9 of her reply brief she argues that in this earlier opinion *we said "that Seabourn was actually indulging in an authorized and permissible form of 'recreation' at the time he crashed his Army vehicle into appellant's car."* (Emphasis is ours.) This quotation is inaccurate and misleading. In that part of the opinion (215 F.2d 800) from which this purported quotation was lifted, we were then discussing *appellant's theory* of Government liability. In a specific reference to *her theory* of the case we said (at page 808):

"In stating her position on the issues, appellant asserts that since (under Army Regulations) a soldier may indulge in 'recreation,' his 'off duty' recreational activities are properly to be regarded as within the scope of his 'military duty.' The assumption necessarily underlying this contention is that Seabourn *was actually indulging in an authorized and permissible form of 'recreation'* at the time he crashed his army vehicle into appellant's car. Upon no other basis can her position be sustained * * *."

To this comment we added the further comment that "upon no other basis can her position be sustained unless we close our eyes and agree that a loose post 'practice' of 'passing around' trip tickets issued only for *official use,* (when the actual use is not for official business) in some undisclosed way transformed the use by Seabourn into an authorized 'official use.'" (Emphasis ours.) And we also emphasized *at that point* that enlisted men's use of the vehicles "for joy riding and drinking bouts, all without the knowledge or approval of their superior officers, finds no sanction in applicable Army Regulations, but to the contrary, is a clear violation of these rules."

In short, this Court did not say what appellant now says was stated in our first Williams opinion upon which she relies.

█ Appellant failed to cite three pertinent California cases which were discussed at some length in the lower court's second opinion (141 F.Supp. 851) and here relied upon by appellee. In Kish v. California State Automobile Ass'n, 190 Cal. 246, 248, 212 P. 27, the California Supreme Court refused to impose a respondeat superior liability

where the employee at the time of the accident was not in performance of any act connected with the business of his employer *but had finished his work for the day and was "off duty" and on his way down town for supper.*

In Lee v. Nathan, 67 Cal.App. 111, 226 P. 970, the California court held that there could be no respondeat superior liability *where the employee was driving the employer's vehicle after duty hours* while pursuing his own ends *despite the fact that the injuries to the plaintiff could not have been committed without the facilities so afforded to the employee.*

And in Slater v. Friedman, 62 Cal.App. 668, 672, 217 P. 795, 796, the court reiterated the rule that where the servant's *"act is done while the servant is at liberty from service and pursuing his own ends exclusively,* there can be no question of the master's freedom from all responsibility, even though the injury complained of could not have been committed *without the facilities afforded to the servant by his relation to his master."* (Emphasis in this reference to the three California cases is ours.)

And see comments of the court in such California cases as Stephenson v. Southern Pacific Co., 93 Cal. 558, 29 P. 234, 15 L.R.A. 475; Brown v. Chevrolet Motor Co., 39 Cal.App. 738, 179 P. 697; Duff v. Schaefer Ambulance Service, 132 Cal. App.2d 655, 283 P.2d 91; Gousse v. Lowe, 41 Cal.App. 715, 183 P. 295. These cases discuss issues pertinent to the issues presented in the instant case.

Only a short time ago, this Court in Pacific Freight Lines v. United States, 239 F.2d 191 emphasized that California law does not impose a respondeat superior liability unless at the time of the accident the employee of the Government was actively engaged in furthering his employer's business rather than his own personal ends. This was a Federal Tort Claims Act suit arising out of an accident involving a military vehicle being driven by a serviceman who had previously been *directed* to drive the car by a superior officer. In that case the principal question was whether, at the time of the accident, the serviceman was acting within the scope of his employment under California law. See page 193 of opinion. In the opinion in Pacific Freight we cited the case of Loper v. Morrison, 1944, 23 Cal.2d 600, 605, 606, 145 P.2d 1, 3–4. There, and in an "in bank" hearing, the California Supreme Court carefully pointed out the relevant circumstances and factors to be considered and weighed in relation to one another in appraising "scope of employment" cases in California. One of these "factors" was "the incidental acts that the employer should reasonably have expected would be done." Our decision in the Pacific Freight case exonerated the Government.

In light of the fact that Seabourn secured possession and use of the army vehicle in violation of applicable army regulations dealing with use of vehicles for recreational purposes, can it be said that (under California law) the superior officers of his army unit should "reasonably have expected" him to wilfully violate these army rules in the manner he did, thereafter get "very drunk" and go on a wild night drive merely to entertain himself? We think not.

Appellant urges that *the important fact* which distinguishes our Pacific Freight case, supra, and the California cases cited by appellee is that in the case at bar, as in the Murphey and (later noted) Boynton cases, "the employee was *authorized* for the benefit of the employer to engage in recreational activities. Deviations in route, as in the Pacific Freight case, are not important. *Here the scope of employment by virtue of the authorization to use the vehicle for recreation, becomes broadened so as to include acts done pursuant to such authorization."* Thus appellant asserts that there was a "broadened authorization" for Seabourn's use of the vehicle for his night ride recreation. But the truth is that no such "broadened authorization" can be found in any language in the Army Regulations; in fact, appellant is compelled, not only to completely repudiate these regulations,

but also to justify a loose practice of flouting them in order to sustain this particular claim. This theory of a "broadened authorization" is novel. It seems to rest upon the assumption that, under and by virtue of the "practice" employed in Seabourn's unit, these "trip tickets" must be regarded by us as something akin to negotiable warehouse receipts or certificates, the free and unlimited use of which was legally justified.

The short of it is that the alchemy of legal argument cannot transmute a clear violation of applicable and controlling regulations by servicemen into a principle of law which we must arbitrarily and artificially apply to create government liability. For us to pursue such a course would amount to a holding that the Army had no legal right to define, by suitable regulations, the proper use of its vehicles.

Appellant's counsel calls upon us to consider the injury of one who was wholly innocent of wrongdoing. Seabourn's vicious conduct is so serious a crime under California law (Calif.Penal Code, Section 367(e)) [4] that the offense could be punished by fine, and by imprisonment in the state penitentiary up to five years. However appealing, it is beyond our power to substitute sympathy for a proper application of the rule of respondeat superior under California law.

We made reference above to the California Boynton case [Boynton v. McKales] (reported in 139 Cal.App.2d 777, 294 P.2d 733) which is here strongly relied on as authority sustaining appellant's theory of tort liability. The facts of that case are detailed by the court and in the margin we note these facts and pertinent holdings of the court.[5]

4. "§ 367(e) Any person operating or driving an automobile, motor cycle or other motor vehicle who becomes or is intoxicated while so engaged in operating or driving such automobile, motor cycle or other motor vehicle, and who by reason of such intoxication does any act, or neglects any duty imposed by law, which act or neglect of duty causes the death of, or bodily injury to, any person, shall be punishable by imprisonment in the state's prison not exceeding five years, or in the county jail not exceeding one year, or by fine not exceeding $500 or by both such fine and imprisonment."

5. Boynton, a minor, was struck by a car driven by Brooks, an employee of McKales. Brooks was then returning to his home from a banquet given by McKales to its senior employees. Judgment on a jury verdict was for Boynton who was injured when standing at night next to his parked car. Brooks had been formally "invited" to a banquet given by his employer. The California court pointed out (139 Cal.App.2d at page 790, 294 P.2d at page 741) that (as to conflicting inferences to be drawn from the evidence) "the only decisive question [for the jury] is therefore whether the character of the banquet and the employer's relation to it were such that Brooks' attendance could be reasonably considered within the scope of his employment." The court added that while there was testimony that there was no "compulsion to attend" the banquet, there was a permissible

inference from the evidence that "it was an official company function with close relation to its sales program and intended to benefit the company by increase in the continuity of employment, * * * the attendance at which was at least expected from the employees."

In applying the rule of respondeat superior the court noted McKales' argument that no recovery could be had *because* the dinner was only "a social affair" which Brooks attended for his own pleasure without direct or indirect compulsion from his employer; that for this reason the evidence was insufficient to bring the case within the exception to the "going and coming rule" known as the "special errand rule."

As to the so-called "special errand rule," the court said that *"if* the employee is not simply on his way from his home to his normal place of work or returning from said place to his home for his own purpose, *but is coming from his home or returning to it on a special errand either as part of his regular duties or at a specific order or request of his employer*, the employee is considered to be in the scope of his employment from the time that he starts on the errand until he has returned or until he deviates therefrom for personal reasons. (Citing cases) *To such special missions the general test as to scope of employment applies.* It is not necessary that the servant is directly engaged in the duties which he was employed to perform, but

**504**

In its decision in the Loper case, supra, 23 Cal.2d at page 606, 145 P.2d at page 4, the court said: "Under the circumstances of this case we cannot hold as a matter of law that Morrison's [the employee] trip to the tavern and to Dolan's home constituted an abandonment of his employer's business. * * * *it was within Morrison's authority to collect accounts* [after his regular hours of work] *at the time the accident occurred.* The employer's liability was not necessarily terminated by reason of the fact that Morrison *combined* a private purpose of his own with the business of his employer [citing Ryan v. Farrell, supra]. 'It is the established rule in this jurisdiction that where the servant is *combining* his own business with that of the master, *or attending to both at substantially the same time,* no nice inquiry will be made as to *which business* the servant was actually engaged in when a third person was injured; but the master will be held responsible, unless it clearly appears that the servant could not have been directly or indirectly serving his master.'" (Emphasis supplied.)

In considering the California rule announced in the Loper case, and under the peculiar circumstances of this case, we again run afoul of the official army regulations which are binding on *all* army personnel when using army vehicles for recreational purposes. No

order came to Seabourn authorizing him to use the vehicle *for any purpose.* His use was surreptitious and a clean-cut violation of the regulations, and for us to insist that such illegal use was "reasonably to be expected" (or was deliberately sanctioned) by army officials would not be justified. Oddly enough, the *practice* (under army regulations) of permitting certain designated *forms of recreation* for army personnel is advanced by appellant to bolster her claim (under a California case) that in any event Seabourn was somehow *combining* his night drive with official army business at the time of the accident, this without any evidence of such "army business" and in the face of his sworn statement that he was then driving only "for recreation." This Court is not unmindful of the injury inflicted on appellant but under the evidence we cannot regard Seabourn's wild night drive as anything other than a senseless and irrational act wholly unconnected with, and not serving or benefiting any business of his employer. For us to reach any other conclusion would do violence to clearly established facts.

Our decision in United States v. Johnson, 9 Cir., 181 F.2d 577, 581, is cited and relied upon by appellant. In appraising the facts we sustained a *finding* of the lower court that Moore, the (Navy) driver of a vehicle (also on Guam) was acting within the scope of his employ-

included are also *missions which incidentally or indirectly contribute to the service, incidentally or indirectly benefit the employer."* Citing among other cases, Kish v. California State Auto Ass'n, supra.

The court also said: "The attendance at a social function, although not forming part of the normal duties of the employee, may come under the 'special errand rule' *if* the function or the attendance was connected with the employment and for a material part intended to benefit the employer who requested or expected the employee to attend." And further: *"If the employee is within the scope of his employment* when he inflicts injuries, the fact that the automobile which caused the injury belonged to the employee will not relieve the employer from liability *if* the

employee's use of his car was with the express or implied consent of the employer." Citing cases including the case of Ryan v. Farrell, supra. (Emphasis supplied.)

Again we come face to face with the question whether Seabourn was on any sort of "mission" *for* his employer when he injured appellant, and whether his wild drive "incidentally or indirectly" benefited his employer. To agree with appellant's theory would compel us to hold that (under California law) Seabourn's drunk drive for his own recreation somehow and in some wholly undisclosed manner conferred some direct or indirect benefit on the United States, a conclusion repudiated by the clear facts of this case.

ment when the injury to Johnson occurred. Moore was attached to a navy service depot and had duties to perform at the Dispensary. On the day of the accident he had been *required* to execute a duty (in and as a part of his course of employment) *to deliver his report* to the Dispensary. An agreed "statement" in evidence indicated that Moore went on a number of other "errands" *before* he got around to taking his report to the Dispensary. Moore finally started to drive toward the Dispensary; for some undisclosed reason, the car started to "shimmy" and the car turned over injuring Johnson who asserted that the facts brought the case within the rule of res ipsa loquitur.

In seeking to apply in the Johnson case what we regarded as California doctrine to the facts, we cited Waack v. Maxwell Hardware Co., 210 Cal. 636, 292 P. 966, where the court held that the question was whether at the time and place of the accident the driver *had resumed his employment* in his master's business *after* one or more deviations for purposes not related to his master's business. The lower court had held that *whether there had been such a resumption of the master's business was a question of fact for the jury.*

In our Johnson opinion we also made reference to the above cited California case of Ryan v. Farrell. We there said: "The fragmentary record here contains no direct evidence as to the circumstances under which the motor vehicle was entrusted to Moore, *or* the use he was permitted to make of it. But since it appears that the vehicle belonged to the government, and that Moore was in the government's employ, the inference is permissible that *Moore was authorized to drive the vehicle in performing his duty of delivering his report.*" (Emphasis supplied.) But we added that under the rule of the Waack's case, supra, the trial judge was justified in *finding* that Moore had *resumed his employment* at the time the accident occurred, and was *then* acting within the scope of his em-

ployment, which on this occasion was the delivery of a report.

As we later note, the trial judge in the instant case made findings repudiating appellant's theory of "scope of employment."

Another case relied on by appellant is Carr v. Wm. C. Crowell Co., 1946, 28 Cal.2d 652, 171 P.2d 5, 6. The recital of facts therein reveals that Enloe, one of Crowell's employees, engaged in a wordy exchange with Carr, an employee of a sub-contractor on the building then being constructed by Crowell. Enloe threw a hammer at Carr, seriously injuring him. Carr brought action against Enloe and Crowell for damages. The trial court directed a (jury) verdict for Crowell but sustained a verdict entered against Enloe.

The holding of the California Supreme Court (reversing the judgment in favor of Crowell) was concisely stated as follows: "It is settled that an employer is liable for wilful and malicious torts of his employee committed in the scope of his employment." In reversing the directed verdict in favor of Crowell, the Court said: "It is sufficient, however, if the injury resulted from *a dispute arising out of the employment.* Under the provisions of section 2338 of the Civil Code a principal is liable for 'wrongful acts' of his agent committed 'in and as a part of' the principal's business. 'It is not necessary that *the assault* should have been made "as a means, or for the purpose of performing the work he (the employee) was employed to do."'" (Emphasis supplied.)

As bearing on the issue arising out of the particular fact situation in the Carr case, the court there cited a California case holding that a grocery store manager was acting within the scope of his employment when *he quarreled* with a customer over an order and injured the customer after an exchange of opprobrious names.

Another California case [Hiroshima v. Pacific G. & E. Co., 18 Cal.App.2d 24, 63 P.2d 340] was there cited wherein the court held that an employee whose

duties were to collect power bills, was acting in the scope of his employment when he struck a customer *in the course of a dispute* as to whether the customer had received a notice that his electric service would be discontinued if he did not pay his bill. The holding was there based on the ground that every man who prefers to manage his affairs through others, remains bound to so manage them that third persons are not injured by any breach of legal duty on the part of such others while acting in the scope of their (employees) duties.

The court commented that the evidence in the Carr case indicates without conflict that the injury to Carr was an outgrowth of Enloe's employment—that *the altercation* arose *solely over the performance of Enloe's duties,* and his entire association with Carr arose out of his employment by Crowell.

As applied to the situation in the Seabourn case, we face the fact that at the time he injured appellant, he was not engaged in an altercation with appellant, nor was he engaged in performing any duty or duties directly or indirectly associated with normal and regular army activities. As a matter of fact, the very purpose and function of his "pass" was to completely free him from the necessity of performing any regular and/or routine army duties (work for his employer) during the entire time covered by the pass permitting him to remain away from his army post.[6]

After argument, counsel for appellant called our attention to Rayonier Incorporated v. United States, 352 U.S. 315, 77 S.Ct. 374, 1 L.Ed.2d 354, and Indian Towing Company v. United States, 350 U.S. 61, 76 S.Ct. 122, 100 L.Ed. 48. We cannot agree that the holdings in these cases require us to reach conclusions different from those expressed above.

We find no rational basis for disagreeing with the conclusions twice expressed in the opinions and decisions of the able and experienced trial judge in the instant case. In his decision now on appeal, he properly found as facts that "the evidence shows that Seabourn was on a frolic of his own, free to find entertainment wherever his own proclivities and desires might lead him"—and further, "Seabourn was neither 'directly or indirectly serving his master' within the scope of his employment, because he was serving only his *own personal desires* not at all connected with any recreational activities authorized by his employer."

In our view these findings of fact represent the only logical conclusions that could possibly be drawn from all of the pertinent facts in evidence. In no respect are they erroneous.

Since we are in full agreement with the lower court's disposition of the issues in this case, its judgment here on appeal must be, and is, affirmed.

6. That Seabourn was away from his army post on a pass and free of any military duty at the time he injured appellant, is not disputed. His then *relationship* to the Government while on this pass or off-duty status "was not analogous to that of a soldier injured while performing duties under orders." Feres v. United States, 340 U.S. 135, 146, 71 S.Ct. 153, 159, 95 L.Ed. 152. And the Court there added that "without exception, the *relationship* of military personnel to the Government has been governed exclusively by federal law." (Emphasis supplied.)

A soldier who is off duty or on a pass is not engaged in the business of the United States. While on pass or leave, one in military service "is at liberty to go where he will during the permitted absence, to employ his time as he pleases,

and to surrender his leave if he chooses. If he reports himself at the expiration of his leave, it is all that can be asked of him." United States v. Williamson, 23 Wall. 411, 415, 90 U.S. 411, 415, 23 L. Ed. 89. (We assume that at any time during leave on a pass, a member of the army could be recalled for miltary duty.)

And see Hunt v. United States, 38 Ct. Cl. 704, 710, and Foster v. United States, 43 Ct.Cl. 170, 175, where the purport of the court's holdings was that a "leave" from service duties is for the sole accommodation of the recipient of the leave privilege; that when a soldier receives a furlough he is for the time being his own master and the master of his time, *and is free to go where he pleases, and do what he pleases, owing no military duty to the Government.*