Cecilia Santos **CONCEPCION** et al.,
Plaintiffs,

v.

**UNITED STATES** of America et al.,
Defendants.

Civ. No. 52–72.

District Court of Guam.

Jan. 29, 1974.

---

FINDINGS OF FACT
AND
CONCLUSIONS OF LAW

DUENAS, District Judge.

This cause came on regularly for trial on the 17th day of December 1973. Ensuing the presentation of testimony of witnesses for plaintiffs, plaintiffs stated to the court that their only remaining witness, the police officer who investigated the accident, could not be present to testify because he was then confined as a patient at the hospital.

The court, on motion of plaintiffs, to which motion the defendants did not ob-

ject, continued the trial to January 14, 1974. Once again the police officer was unable to be present to testify because of some unforeseen circumstances beyond the control of said police officer. Plaintiffs then stated to the court that if said officer were on the witness stand, he would have testified as to the cause of the accident, the parties involved in the accident, and the vehicles involved in said accident. Said officer, however, would not have presented any testimony on matters touching upon the scope of employment or authority of the operator of the vehicle involved belonging to, or under the control of, the United States of America.

The depositions of Michael L. Monroe, the operator of the United States vehicle, was then offered in evidence and admitted as such by the court.

Except for the testimony of the investigating officer, the plaintiffs would then have rested their case.

The defendants then made an oral motion for dismissal of the action upon the ground that upon the facts and the law, the plaintiffs have shown no right to relief, in that the operator of defendant's vehicle was not acting within the scope of his employment at the time he operated the vehicle involved in the accident.

Michael L. Monroe, though named a party defendant, was not subject to the jurisdiction of the court, not having been served with a copy of the complaint and summons. Should service be made on Monroe, the court would then have to dismiss the action against him pursuant to Section 2679(b), Title 28, U.S.C.

The court having duly considered the evidence and being fully apprised in the premises now finds the following:

## FINDINGS OF FACT

### I.

Two vehicles collided in the evening hours of 9:00 to 9:15 on April 7, 1971 in the vicinity of the Naval Communications Station area in front of the highway entrance of the Federal Aviation Administration headquarters.

### II.

Plaintiff Antonio L. G. Sablan was the owner and operator of one of the vehicles: a 1970 Datsun Station Wagon. Plaintiffs Francisco C. Concepcion and Cecilia S. Concepcion, husband and wife, were passengers in Sablan's vehicle. Michael L. Monroe, a Second Class Boatsman Mate, United States Navy, was the operator of the other vehicle, a 1966 Rambler 550, Classic Station Wagon, allegedly owned or leased by the Special Services Division, United States Naval Station, Guam, an instrumentality of the United States of America, a named defendant. Employers Liability Assurance Corporation, Ltd., the insurer of the Special Services Division, is the other defendant. J. C. Hudson, also a member of the United States Navy, was a passenger in the vehicle operated by Monroe. All the plaintiffs sustained personal injuries as a result of the accident.

### III.

The Special Services Division takes care of all the recreational facilities provided by the Naval Station, Guam. On April 7, 1971, it also operated a base taxi and a rent-a-car service. The division's complement at the time consisted of 15 men headed by the Special Services Officer.

### IV.

On April 7, 1971, Monroe, who has been in the Naval Service for a period of 10 years, was the leading Petty Officer of the Special Services Division. He was the Range Manager of the Roti Skeet Range. The department under Special Services to which Monroe was attached was involved in recreational activities only. Other departments under Special Services operated a base taxi service and rent-a-car services. Monroe's immediate superior at the time was a Chief Petty Officer.

### V.

Monroe's specific duty on April 7, 1971 involved the operation and maintenance of the Navy Skeet shooting facility. Additional duties consisted of pur-

chasing and picking up of certain items for fishing boats, the football field and the baseball diamonds. This part of Monroe's job usually necessitated the taking of trips twice a week to Agana about 12 to 15 miles away from his place of employment. At times Monroe might be required to do some related work for other bases in Guam. Normally Monroe's time would be apportioned on a 50–50 basis between office work at the Special Services Division office and the skeet range.

## VI.

Monroe's regular working hours were from 8:00 a. m. to 4:30 p. m. or 5:00 p. m. Outside of the regular working hours, he was subject to be called upon for additional duty should the need arise. Rarely would he be called upon for duty after the regular working hours. During off-duty, even though subject to call, Monroe was free to do as he pleased.

## VII.

The operation of the Special Services Division provides the use of a so-called "duty driver". The duty driver is charged with the responsibility of locking up the gymnasiums and would stay after working hours and keep the office open until the other facilities of Special Services have turned their money in. The duty driver would regularly be at the Special Services office awaiting any specifically assigned duties or orders coming from the Special Services Officer. The duty driver was not under the control or command of Monroe.

On occasions when the duty driver was not available, such as being on any assigned errand, Monroe would serve as a backup man or would let his assigned vehicle serve as the backup vehicle for the duty driver.

## VIII.

As Petty Officer in Charge of the Special Services Division, Monroe had to have a car to do his job. In this connection, he had been using the Rambler for a period of three or four months prior to the collision. There was no written assignment of the Rambler to Monroe, though he was authorized to use said vehicle by his Division Officer and the Chief Petty Officer in Charge.

## IX.

The Division Officer told Monroe that he would keep the vehicle at the barracks for his use as a Leading Petty Officer of the Special Services Division. Though there was never any discussion between Monroe and his superiors about using or not using the vehicle for personal reasons, Monroe, nevertheless had the impression that he was to use the vehicle for business purposes only, and that was what it was being used for.

## X.

On April 7, 1971, Monroe terminated his regular working day around 5:45 p. m. From his place of work, he went to his barracks, changed his clothes and then went to the club and had a beer. He then went back to the barracks, did his laundry, and about an hour or two thereafter, he took the trip to the NCS area which resulted in the collision.

## XI.

On the evening of April 7, 1971, Monroe was contacted by a serviceman, known by Monroe as one having the initial J. C., for the purpose of taking said serviceman to the Naval Communications Station, Guam. It was related to Monroe by the serviceman that something was wrong with his parents in the States and that he had to go to NCS. Since the duty driver was not available, Monroe decided that he himself would take the man to NCS to find out just what was going on. Even if the duty driver were available, Monroe could not order him to take the serviceman to NCS. At the most, Monroe could have requested the duty driver to give the serviceman a ride to NCS, should it happen that the driver have an assignment to NCS.

## XII.

Monroe, in taking the serviceman to NCS, did so pursuant to the serviceman's request. He was not ordered by

anyone to do so, and simply relied on his own judgment. His primary purpose in making the trip was to accommodate the serviceman, and for no other purpose. It was done as a personal favor and for the convenience of the serviceman, a shipmate, and not in furtherance of any business of the United States. Monroe was not compensated by anyone for the trip, not even by his employer, the United States of America. Neither the United States, through any of its officers, or employees, or anybody in authority had any specific knowledge that Monroe at the time used the vehicle for the purpose stated.

### CONCLUSIONS OF LAW

From the facts above stated, the court makes its Conclusions of Law, as follows:

#### I.

Jurisdiction is vested in this court pursuant to 28 U.S.C., Section 1346(b). Section 1346(b) provides for the maintenance of "civil actions on claims against the United States, . . . caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant *in accordance with the law of the place where the act or omission occurred.*" This is subject to the provisions of chapter 171, Title 28, U.S.C. [Tort Claims Procedure]. (Emphasis supplied).

#### II.

28 U.S.C., Section 2671, defines "employee of the government" to include, among others, officers or employees of any federal agency, members of the military or naval forces of the United States. Said section also defines "acting within the scope of his office or employment", in the case of the military or naval forces of the United States to mean acting in line of duty.

#### III.

█ The plaintiffs are not entitled to trial by jury despite their request for such jury trial. 28 U.S.C., Section 2402. The United States is the party primarily liable under the action. Co-defendant Employers Liability Assurance Corporation, Ltd., the United States insurer, is only liable derivatively.

#### IV.

██ The standards of liability under Sections 1346 and 2671, of Title 28, U.S.C., is with respect to both military and civilian employees that imposed by the respondeat superior doctrine of the state. United States v. Taylor, CCA6 1956, 236 F.2d 649. "Employee" within subsection (b), Section 1346, and Sections 2671 et seq., of Title 28, U.S.C., whereby government consents to be sued for injuries caused by acts of employee of government has the same general meaning as the term "servant" has in body of rules relating to doctrine of respondeat superior. Brucker v. United States, CCA9 1964, 338 F.2d 427, certiorari denied, 381 U.S. 937, 85 S.Ct. 1769, 14 L.Ed.2d 701.

#### V.

In Chapin v. United States, CCA9, 258 F.2d 465, plaintiff brought an action against the United States for injuries sustained in a collision in California with an automobile driven by a member of the armed forces. The court held that in construing "within the scope of employment", California law was controlling. The court also stated that the common law doctrine of *respondeat superior* has been made a part of the statutory law of California (Cal.Civ.Code, Section 2338).

#### VI.

In the case of Clough v. Allen, et al., 115 Cal.App. 330, 1 P.2d 545, the court held that a master is not responsible for the negligence of his servant while pursuing his own ends. The doctrine of respondeat superior cannot be invoked in an action for personal injuries unless at the time of the negligent act causing the injury complained of the servant was engaged in performing a service for the master or some act incidental thereto.

Similarly the court held in Lane, et al. v. Safeway Stores, Inc., et al., 33 Cal. App.2d 169, 91 P.2d 160, that it is firmly established as the law that where an employee acts without any reference to the service for which he is employed and not for the purpose of performing the work of his employer, but to effect some independent purpose of his own, the employer is not responsible in that case for either the act or omission of the employee.

## VII.

Section 2338, Civil Code of Guam, provides, in part, that:

". . . a principal is responsible to third persons for the negligence of his agent in the transaction of the business of the agency, including wrongful acts committed by such agent in and as part of the transaction of such business, and for his willful omission to fulfill the obligations of the principal."

This section is taken verbatim from Deering's Civil Code (Calif.), Section 2238. Such is in accord with the letter and spirit of the common law doctrine of respondeat superior and governs cases involving master and servant as well as principal and agent relationships.

The California cases construing the doctrine of respondeat superior are persuasive in the construction of similar Guam laws.

## VIII.

■ The operator of the vehicle leased to, or owned by, the United States, involved in the accident on April 7, 1971, was not acting within the scope of his employment as an employee of the United States or in line of duty as a member of the United States Navy.

## IX.

The plaintiffs take nothing by their complaint and that the parties should bear their own costs.

Let judgment be entered accordingly.

So ordered.